IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TOM DOE,<br><br>    Plaintiff,<br><br>  v.<br><br>PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS; PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS; BOY SCOUTS OF AMERICA; ORE-IDA COUNCIL OF THE BOY SCOUTS OF AMERICA,<br><br>    Defendants. | Case No. 1:09-cv-00351-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

Plaintiff Tom Doe was a member of Boy Scout Troop 101 in Nampa, Idaho, which was sponsored by the LDS Church. He alleges that he was repeatedly sexually abused by his Scoutmaster and Quorum Advisor Larron Arnold.  He claims that both organizations knew about the danger of abuse.  But instead of disclosing this danger to Doe, they promoted scouting as a safe, trustworthy, and fun organization for boys.  According to

Doe, they also represented that Arnold was a trusted youth leader worthy of his Scoutmaster role despite knowing that he had previously molested another boy.

In 2008, Doe filed a complaint naming as defendants two governing entities of the LDS church ("Church Defendants") and two governing entities of the Boy Scouts of America ("Boy Scout Defendants"). Doe asserts several claims against Defendants, including constructive fraud. Both the Boy Scout and Church Defendants seek summary judgment on Doe's constructive fraud claims. The Church Defendants also ask the Court to reconsider a previous decision relating to choice of law. The Court heard oral argument on August 27, 2012, and took the matter under advisement.

Having considered the briefs and the record, as well as oral argument, the Court will deny both the Boy Scouts and the Church Defendants' motions for partial summary judgment (Dkts. 197 & 198). The Court will also deny the  motion to strike (Dkt. 209).

## BACKGROUND

### 1. Factual Background

Plaintiff Tom Doe was born in 1953. Between 1965 and 1971, Doe was an active member of Boy Scout Troop 101, a troop sponsored by the Nampa, Idaho, 2nd Ward of the Church of Jesus Christ of Latter-Day Saints. *Church Defs' SUF* ¶¶ 2-3, Dkt. 197-2. According to troop rosters, Doe joined Troop 101 in 1964. *Scout Defs' SUF* ¶ 5, Dkt. 198-1. The Boy Scouts invited Doe to join Scouts by making its program available to Doe through the sponsoring organization, the LDS Church. *Pl's SDF* ¶ 30.

Larren Arnold became Scoutmaster of Troop 101 in 1964, the same year Doe joined. Arnold was also Doe's Quorum Advisor. *Id.* ¶ 5. As Scoutmaster and Quorum Advisor, Arnold led spiritual, educational, and Boy Scout-related activities for the youth of the Nampa 2nd Ward and Boy Scout Troop 101. *Id.* at ¶ 4.

Doe's experience with the Aaronic Priesthood in the LDS Church taught him to trust, obey, and respect his Scoutmaster. *Id.* ¶ 31. His experience with the Boys Scouts, which encouraged and fostered close, friendly, trusting relationships between Scouts and Scoutmasters, reinforced his trust in Arnold. *Id.* ¶ 33. Doe's recollection is that Arnold was a close friend to both him and his family, as he was Scoutmaster for Doe's two brothers. *Id.* Arnold allegedly gained the trust of Doe through time spent together, discussions, and mentorship. But Doe's father does not remember meeting Arnold, much less remember him as a close family friend. *Id.*

It is undisputed, however, that Arnold led Troop 101, including Doe, on overnight camping trips throughout Idaho. In addition, Doe accompanied Arnold, alone, on several day trips into Oregon to fish and search for potential camp sites for the troop. *Id.* ¶ 29. During at least five of these trips associated with scouting in both Oregon and Idaho, Arnold sexually abused Doe. *Id.* ¶ 29. The abuse in Idaho occurred during the overnight camping trips with Troop 101. The abuse in Oregon occurred when Doe accompanied Arnold on day-trips into Oregon. *Id.* ¶ 29. According to Doe, his experience mirrors examples of other Scout experiences set forth in the Ineligible Volunteer Files maintained by the Scouts: "Scouts entrusting themselves to a Scout leader's guidance and protection

while on camping trips, hiking trips, sleep overs, or other events, only to be sexually abused by the Scout leader." *Pl's SDF* ¶ 36.

Doe claims that the Boy Scouts of America "has always had a known problem with adult volunteers abusing Scouts." *Pl's Resp.* at 10, Dkt. 203. In the early 1900s, the Boy Scouts of America began keeping "Ineligible Volunteer Files" on individuals banned from volunteering in scouting. *Id.* ¶ 23. The "Perversion" category contains the most files and comprises any type of sexual misconduct, including child abuse. *Id.* ¶ 24. Before Doe became a Scout, the Boy Scouts of America had compiled "thousands of incidents of child abuse" within scouting involving its adult volunteers. *Id.* And by the time Doe joined scouting, Boy Scouts of America was creating approximately 40 to 60 Perversion Files each year. *Id.*

Indeed, Doe claims that both the Boy Scout and the Church defendants had specific notice that Arnold was a child molester and danger to children. Richard White, a member of the Nampa 2nd Ward, testified that he told Bishop Leon Hales that his son, also a Scout in Troop 101, had been molested by Arnold, his Scoutmaster. *Id.* Bishop Hales purportedly responded that he would "take care of it." And a week later, Bishop Hale told White that he "had taken care of it." *Id.* Hales was a member of the Ore-Ida Council, the local Council for the Boy Scouts of America, when this conversation allegedly took place in the fall of 1964. *Id.* ¶ 45.

Because of the abuse by Arnold, Doe has suffered physical and emotional damages. *Id.* ¶ 52. His physician diagnosed him with posttraumatic stress disorder as a

result of the abuse.  *Id.*  Doe says that he also suffers from other behavioral issues related to the sexual abuse, such as avoidance, dissociation amnesia, compartmentalization, and denial.  *Id.*  Additionally, he claims, he suffers from a number of other physical ailments from the abuse, including hypertension, high blood pressure, acid reflux, and sexual dysfunction. *Id*.

### 2.  Procedural Background

Doe filed a complaint in Malheur County District Court, Oregon, on February 21, 2008.  On March 25, 2008, the complaint was removed to the federal district court for the District of Oregon.  *Notice of Removal*, Dkt. 2.  The First Amended Complaint, Dkt. 25, was filed on May 5, 2008.  The FAC set forth claims for (1) sexual abuse of a child under a respondeat superior theory; (2) intentional infliction of emotional distress under a respondeat superior theory; (3) negligence; and (4) fraud by omission.  The matter was transferred to this Court on July 9, 2009.  *Order Adopting Report and Recommendations*, Dkt. 74.

On August 12, 2010, U.S. District Judge David Carter, sitting by designation, granted in part and denied in part the Defendants' motion to dismiss the First Amended Complaint.  *Order Granting in Part and Denying in Part Motion to Dismiss*, Dkt. 109. The Court dismissed as time-barred Doe's first claim, sexual abuse of a child, and second claim, intentional infliction of emotional distress, insofar as they arose out of events occurring in Idaho.  These claims remained to the extent they arose out of events occurring in Oregon.  The court dismissed as time-barred Doe's negligence claim.  The

court dismissed Doe's fraud claim, with leave to amend, finding the allegations insufficient to meet Fed. R. Civ. P. 9(b)'s pleading particularity requirements.

Doe filed his Second Amended Complaint on August 25, 2010.  Dkt. 110.  The Second Amended Complaint set forth claims for (1) sexual abuse of a child under a respondeat superior theory; (2) intentional infliction of emotional distress under a respondeat superior theory; (3) institutional fraud by omission; and (4) constructive fraud. The Second Amended Complaint survived a second motion to dismiss filed by the Boy Scout Defendants.  The Court found that Doe's fraud claims were governed by the fraud statute of limitations, and not the statute of limitations for personal injury claims.  The Court also found that the complaint adequately set forth allegations of fraud under requirements of Rules 8(a) and 9(b).

Now Defendants seek summary judgment on the fraud claims.  The Church Defendants also ask the Court to reconsider Judge Carter's decision finding that Oregon law applies to the abuse occurring in Oregon.  Both the Boy Scouts and the Church Defendants have objected to evidence submitted by Doe.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . .." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural

shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The Court must be "guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255. If a claim requires clear and convincing evidence, the question on summary judgment is whether a reasonable jury could conclude that clear and convincing evidence supports the claim. *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out

the absence of evidence to support the nonmoving party's case.  *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor.  *Id.* at 256-57.  The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

Only admissible evidence may be considered in ruling on a motion for summary judgment.  *Orr v. Bank of America,* 285 F.3d 764, 773 (9th Cir.2002); *see also* Fed.R.Civ.P. 56(e).  In determining admissibility for summary judgment purposes, it is the contents of the evidence rather than its form that must be considered.  *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003).  If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay.  *Id.* (affirming consideration of hearsay contents of plaintiff's diary on summary judgment because at trial, plaintiff's testimony of contents would not be hearsay).

## DISCUSSION

### 1. Motion to Strike

The Church Defendants ask the Court to strike Doe's declaration as a "sham affidavit." The sham affidavit rule precludes a party from filing a declaration or affidavit in response to a motion for summary judgment that "flatly contradicts" the party's earlier

deposition testimony. *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). Given that the Court must draw all inferences in favor of Doe, it cannot find that Doe's declaration flatly contradicts his deposition testimony. Any inconsistencies between Doe's declaration testimony and his deposition testimony are not clear contradictions. Rather, they appear to reflect matters which he now recalls, but did not recall at the time of his deposition. Therefore, they go to the weight of the evidence, not its admissibility. For this reason, the Court will deny the Church Defendants' motion to strike. However, since Doe has agreed to withdraw his references to the May 31, 1990 letter in Arnold's IV File describing Arnold's ecclesiastical leader's knowledge of Arnold's molestation of other Scouts, the Court will not consider it in deciding the partial summary judgment motions.

## 2. LDS Church Defendants' Motion for Partial Summary Judgment

The Church Defendants move for summary judgment on Doe's fraud claims. Their arguments shifted in their reply to account for Doe's dropping his institutional fraud claim and recasting his constructive fraud claim. The Church Defendants object to Doe's reformulation of his constructive fraud claim. They also contend that the re-cast claim is barred by the statute of limitations and does not meet the elements for constructive fraud, including the requirement that a confidential relationship exist.

### A. *Richard White's Testimony Regarding Arnold*

In his complaint, Doe asserted claims for "institutional fraud by omission" and "constructive fraud." He now abandons his "institutional fraud by omission" claim

against the Church and instead focuses solely on the Church's allegedly fraudulent representations regarding Arnold.  Specifically, Doe alleges, "By holding out Arnold as a trusted youth leader worthy of being the Scoutmaster, while not disclosing that Arnold had been accused of molestation prior to Plaintiff's abuse, Church Defendants committed constructive fraud against Plaintiff."  *Pl's Resp.* at 5, Dkt. 206.  Doe says this claim is encompassed in his Fourth Claim for Relief.

The Church Defendants cry foul over what they argue is Doe's complete reformulation of his constructive fraud claim against them. They contend that Doe based his fraud claims "on the allegation of a *generalized danger of sexual abuse within scouting*" – not on specific fraudulent representations regarding the danger Arnold posed. The Church argues that Doe should not be allowed to shift his fraud theory this late in the game.

Nowhere in his Complaint did Doe mention any specific fraudulent representations regarding the danger Arnold posed. "The complaint, however, does not control the issues properly before this court." *Apache Survival Coalition v. United States,* 21 F.3d 895, 910 (9th Cir. 1994).  When new issues or evidence supporting a legal theory outside the scope of the complaint is introduced in opposition to summary judgment, a district court should construe the matter as a request to amend pleadings under Federal Rule of Civil Procedure 15(b). *Id.* (citing 18 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 2721, at 43–46 ) ("The formal issues framed by the

pleadings are not controlling on a motion for summary judgment; the court must consider the issues presented in other material offered by the parties....").

While it is true that Doe's complaint did not specifically mention representations about Arnold, neither does Doe now allege entirely new facts or conjure up an entirely new theory. Doe did not unfairly spring Richard White's testimony on the Church. Indeed, the Church Defendants, along with Doe and the Boy Scout Defendants, deposed White. And from the beginning, Doe alleged that the Church Defendants failed to disclose the known dangers of pedophilic Scoutmasters. What better proof that the Church knew Scoutmasters were molesting young boys placed in their charge than its specific knowledge regarding the danger Arnold posed?

Because the Church Defendants had general notice of Doe's constructive fraud theory and because they also had notice of White's statements and an opportunity to depose him, the Court will consider the Church's alleged knowledge regarding Arnold in assessing Doe's constructive fraud claim. Richard White's testimony regarding the Church's alleged knowledge of the dangers Arnold posed is not so outside the bounds of Doe's existing constructive fraud claim to justify excluding this evidence. To alleviate any prejudice to the Church, the Court will allow the parties to conduct further discovery on this issue, if necessary.

**B. *Statute of Limitations***

Before reaching the merits of Doe's constructive fraud claim, the Court must decide whether the Idaho statute of limitations bars the claim. The Church Defendants

argue that the shorter statute of limitations for personal injury claims – rather than the three-year fraud statute of limitations with its discovery rule – applies because Doe's fraud claim is really a personal injury claim. *Church Defs' Reply* at 2, Dkt. 212

The Court considered and rejected this exact argument in denying the Boy Scout Defendants' motion to dismiss Doe's fraud claims: "the Court concludes that the specific statute of limitations applicable to fraud claims – Idaho Code § 5-218(4) – applies to Doe's [fraud claims]." *Memorandum Decision and Order* at 15, Dkt. 147. Citing the Idaho Supreme Court in *Umphrey v. Sprinkel*, 682 P.2d 1247 (Idaho 1983), this Court reasoned that "that the Idaho legislature made a policy choice to provide greater leeway for a potential plaintiff who alleges fraud, because of the inherent difficulties in pursuing such a claim." *Id.* at 13. The Court therefore concluded that the applicable statute of limitations is determined by the nature of the claim asserted – not by the nature of the plaintiff's injury.

*Trimming v. Howard*, 16 P.2d 661, 662 (Idaho 1932), cited by the Church Defendants, does not require that the Court reconsider its earlier decision. In *Trimming*, the Idaho Supreme Court held that negligent treatment followed by fraudulent concealment does not come within the discovery rule unless fraud as opposed to malpractice is the gravamen of the action. *Id.* at 663. The Church Defendants say *Trimming* is still good law, but the Idaho Supreme Court has since said that the language in *Trimming* regarding fraudulent concealment and the tolling of the statute of limitations in professional malpractice actions has been "rendered obsolete." *Johnson v. Gorton*,

495 P.2d 1, 3 (Idaho 1972).  The Court therefore sees no reason to deviate from its earlier decision on this exact issue.  As previously decided, the specific statute of limitations applicable to fraud claims – Idaho Code § 5-218(4) – applies to Doe's fraud claims against the Boy Scout *and* the Church Defendants.

Under Idaho Code § 5-218(4), Doe's reframed fraud claim survives. The statute of limitations begins to run when "the plaintiff knew or reasonably should have known of the facts constituting the fraud." *McCorkle v. Northwestern Mut. Life Ins.Co.*, 112 P.3d 838, 842 (Idaho App. 2005).  Here, Doe did not learn about Richard White's report of abuse to Bishop Hale until sometime in 2007 or 2008, and thus he did not discover "the facts constituting the fraud" until that time – around the time he filed his original complaint.

The Church Defendants argue that the discovery of White's alleged conversation with Bishop Hales "is totally irrelevant to constructive fraud" because a constructive fraud claim does not require proof that the Church knew the representations it allegedly made were false.  *Church Defs' Reply* at 6, Dkt. 212.  The Church's argument, however, misconstrues the nature of Doe's constructive fraud claim.  Doe alleges that the Church Defendants committed constructive fraud by failing to disclose a *known* danger of abuse. If the Church knew of no danger of abuse, no constructive fraud claim would arise: the Church could not disclose what it did not know.  And Doe could not have learned of the alleged facts constituting fraud until he learned, through Richard White or discovery of

the IV files, that the Church knew about the dangers of a pedophilic Scoutmaster and failed to disclose this information.

The Court therefore rejects the Church Defendants' argument.  Doe's re-framed constructive fraud claim survives.

## C. *Elements of Constructive Fraud*

 "An action in constructive fraud exists when there has been a breach of a duty arising from a relationship of trust and confidence, as in a fiduciary duty." *Gray v. Tri-Way Const. Services, Inc.*, 210 P.3d 63, 71 (Idaho 2009) (citation omitted).  To prove constructive fraud, a party must prove the existence of a confidential relationship. *Gray*, 210 P.3d at 71. When a confidential relationship is found to exist, the one in whom confidence was reposed may be held to a higher standard of disclosure and fairness than in an arm's-length relationship.  *McGhee*, 353 P.2d 760, 763 (1960).

### (1) Commercial Transaction Requirement

Contrary to the Church Defendants' suggestion, actions for constructive fraud may arise outside the commercial context.  Although it is true that most fraud claims involve monetary damage resulting from business transactions, nothing in Idaho law expressly confines constructive fraud claims to commercial settings.  Indeed, *McGhee*, the seminal Idaho constructive fraud case, did not involve a commercial transaction.  353 P.2d 760.

In *McGhee*, a husband asked his wife to leave so he could resume living with his first wife. 353 P.2d at 761. The second wife later learned that her husband was still married to his first wife when he married his second wife.  *Id.*  His second wife sought an

annulment, alleging that her husband had committed fraud by failing to disclose that he was already married at the time of their marriage.  The Idaho Supreme Court found that, if the husband believed he was still married to his first wife, "it was clearly his duty to disclose such facts" to his second wife before marrying her. *Id.* at 763.  As explained by the court, "Such concealment on the part of appellant was misleading and where, as here, there was a duty to speak because of a confidential relationship, a failure to do so is a specie of fraud for which equity may afford relief."  *Id.*

As *McGhee* illustrates, the Church Defendants' attempt to confine constructive fraud claims to business situations is unwarranted and contrary to general common-law principles.  Even if marriage is technically a contract, the law does not deem it a commercial transaction.

Section 557A of the Restatement (Second) of Torts, although not expressly adopted by Idaho courts, further supports the application of fraud to a noncommercial setting: "One who by a fraudulent misrepresentation or nondisclosure of a fact that it is his duty to disclose causes physical harm to the person…of another who justifiably relies upon the misrepresentation, is subject to liability to the other." Restatement (Second) of Torts § 557A (1977).  Comment a to section 557A explains: "The rule here stated permits a tort action of deceit to be maintained, when there is physical harm to person….who justifiably relies on it." *Id.*, Comment a, at 149.

In addition, courts in other jurisdictions have allowed an action for fraud outside a business or contractual setting.  In *B.N. v. K.K.*, 538 A.2d 1175 (Md. 1988), for example,

the court allowed a claim for wrongful transmission of genital herpes to be stated in terms of fraud even though the fraud did not occur in a business setting. *Id.* at 1184.  The court found that the defendant implicitly represented he was in good health by concealing the fact he had genital herpes, which caused harm to the plaintiff. *Id.*  Similarly, in *Kathleen K. v. Robert B.*, 198 Cal.Rptr. 273 (Cal.App. 2 Dist. 1984), the court found that the plaintiff had asserted claims for both negligence and fraud based on her allegation that she sustained a physical injury as a result of the defendant's "tortious conduct in either negligently or deliberately failing to inform her that he was infected with venereal disease." *Id.* at 276. *See also Doe v. Dilling,* 861 N.E.2d 1052, 1067–68 (2006) (tort of fraudulent misrepresentation applied to plaintiff's claim arising from parents' misrepresentations that plaintiff's fiancé suffered from heavy-metal poisoning and Lyme disease and not AIDS).

None of these cases is binding on the Court, of course.  But their reasoning is both persuasive and consistent with Idaho law.  The Idaho Supreme Court's definition of constructive fraud is expansive: "In its generic sense constructive fraud comprises all acts, omissions and concealments involving a breach of legal or equitable duty, trust or confidence and resulting in damage to another."  *McGhee*, 353 P.2d at 762.  In no way does this language limit constructive fraud to a business setting.  The Court therefore declines to impose a limitation on constructive fraud claims not clearly imposed by Idaho courts.

*(2) Duty to Disclose*

The Church Defendants suggest that a constructive fraud claim cannot be based on silence.  Not so.  As discussed above, the Idaho Supreme Court explained in *McGhee* that, "where, as here, there was a duty to speak because of a confidential relationship, a failure to do so is a specie of fraud for which equity may afford relief." 353 P.2d at 763. And as just noted, "constructive fraud comprises all acts, omissions and concealments" – not just false statements. *Id.* at 762.  The key issue, therefore, is whether a confidential relationship existed between Doe and the Church Defendants.

Idaho courts have not defined fiduciary or confidential relationships precisely, nor could they.  The existence of a fiduciary duty is a question of fact: "A fiduciary relationship does not depend upon some technical relation created by or defined in law, but it exists in cases where there has been a special confidence imposed in another who, in equity and good conscience, is bound to act in good faith and with due regard to the interest of one reposing the confidence." *Jones v. Runft, Leroy, Coffin & Matthews, Chartered*, 873 P.2d 861, 867-868 (Idaho 1994); *see also In re Daisy Systems Corp.*, 97 F.3d 1171, 1178 -1179 (9th Cir. 1996) ("[T]he existence of a fiduciary relation is a question of fact.").  The vulnerability that is the necessary predicate of a confidential relation may arise "by reason of kinship, business association, disparity in age, etc.," which results in one person reposing a high degree of trust or confidence in another. *Klein v. Shaw*, 706 P.2d 1348, 1351 (Idaho App. 1985).

Idaho courts have not decided whether a church, as an organization, owes a fiduciary duty to its members.  But other jurisdictions have considered whether a member may have a confidential relationship with the Church.  Two key themes emerge from these cases.

First, a fiduciary relationship is more likely to arise between a child and a church than between an adult and a church.  As one court explained in rejecting the adult plaintiff's breach of fiduciary duty claim: "because the present case does not involve a minor child, it does not involve a 'justifiable trust confided on one side' and a 'resulting superiority and influence' on the other." *See, e.g., DeCorso v. Watchtower Bible & Tract Society of N.Y., Inc.*, 2000 WL 1687110, *5 (Conn. Sup. Ct. 2000).

Second, many courts appear to follow what this Court will characterize as a parishioner-plus rule. These cases hold, in essence, that a fiduciary relationship does not arise between the church and all parishioners generally.  Instead, a parishioner plaintiff must submit facts demonstrating that his relationship with the church differed from other general parishioners' relationship with the church.  *See, e.g., Doe v. Holy See (State of Vatican City)*, 17 A.D. 793, 795 (N.Y. App. Div. 2005).

In *Martinelli v. Bridgeport Roman Catholic Diocesan Corporation*, the jury found a fiduciary relationship between the diocese and Martinelli, a child parishioner who had been sexually abused by a priest.  196 F.3d 409, 429 (2d Cir. 1999). The Second Circuit upheld the jury's finding, based on evidence that the diocese was connected to Martinelli in several ways: it ran the high school that Martinelli attended; it knew Martinelli

participated with a group of boys in sessions with Father Brett (the alleged abuser), who was supposed to act as a mentor and spiritual advisor; it encouraged Father Brett to work with church youth; and it allowed Father Brett to escort boys on church field trips.  *Id.* at 429-30. The court explained that through Martinelli's involvement in "particular activities . . . including those which the Diocese sponsored, [he] had a particularly close relationship with the Diocese from which a fiduciary duty might arise, . . . ." *Id.*

The Supreme Judicial Court of Maine has also held that a victim of child sexual abuse by a priest could establish a fiduciary relationship with the diocese. *Fortin v. The Roman Catholic Bishop of Portland*, 871 A.2d 1208 (Me. 2005).  The court noted that the victim had "prolonged and extensive involvement with the church as a student and altar boy," which distinguished him from a plaintiff "who asserts nothing more than general membership in a religious organization." *Id.* at 1220.  As the court explained, a "child who is both a student and an altar boy is subject to the supervision, control and authority of the Diocese on a daily basis. At its very core, this is a relationship marked by the 'great disparity of position and influence between the parties' that is a hallmark of a fiduciary relationship." *Id.* (citations omitted).

The themes emerging from these cases coincide with Idaho law.  Idaho courts recognize that disparity in age may result in one person reposing a high degree of trust or confidence in another. *Klein*, 706 P.2d at 1351 (citing *Hanger v. Hess*, 288 P. 160 (1930))(finding a confidential relation between elderly man and divorcee).  And, under Idaho law, "[e]quity has never bound itself to any hard and fast definition of the term

'confidential relationship'…but has reserved discretion to apply the doctrine whenever it believes a suitable occasion has arisen." *Id.*  So a blanket rule barring a confidential relationship between a church and a parishioner would not arise in Idaho just as it did not in *Martinelli* and *Fortin*.  Rather, Idaho law requires that the Court examine the particulars of Doe and the Church Defendants' relationship to determine whether a jury could reasonably find that a special relationship of trust and confidence existed between Doe and the Church.

Four key facts operate in Doe's favor: (1) he was a minor child when he was allegedly abused by Arnold; (2) he was an active and regular participant in camping trips and other activities provided through a Church-sponsored organization; (3) he was strongly encouraged by the Church to participate in those camping trips and activities; and (4) the Church allegedly knew of the specific danger that Arnold posed. Also, the Church taught Doe to respect and trust his Church and Scout youth leaders.  And presumably, Doe's parents trusted Arnold enough, in his role as a Church and Scout leader, to allow him to take Doe on overnight camping trips and individual day trips.  On these scouting trips, Doe's parents entrusted Arnold to ensure Doe's safety and act as his caretaker.

Additionally, the Church's alleged knowledge of Arnold's dangerousness is a factor triggering a duty to disclose simply by virtue of the information disparity.  In *Martinelli*, the court explained:  "It was also reasonable for the jury to conclude, based on evidence as to the specific information that the Diocese received about Brett's

misconduct… that the Diocese owed Martinelli… a duty to investigate and warn or inform…. We agree with the district court, therefore, that the jury's finding of a fiduciary relationship under Connecticut law was supported by the evidence." 196 F.3d at 430. Similarly, in *Fortin*, the court noted that a fiduciary relationship giving rise to a duty to protect did not "exist simply because of Fortin's status as a student and altar boy, but because of the added assertion that the Diocese knew or should have known of the risk of harm posed by the priest who abused Fortin." 871 A.2d at 1222.

Based on these facts, as in *Martinelli* and *Fortin*, a jury could find that the Church occupied a superior position of influence and authority over Doe, who in turn reposed trust and confidence in the Church.  This is enough for Doe to survive summary judgment on the confidential relationship issue.

Nor does this conclusion unconstitutionally require the Court to examine church doctrine, or otherwise infringe on the Church's rights under the Free Exercise Clause of the First Amendment.  To find a confidential relationship in this case would not require a jury to examine religious doctrines or practices.  Doe's claim is based on secular law, not Church law.  The Free Exercise Clause does not provide immunity to churches for alleged violations of duties imposed by secular law.

*(3) Damages*

The Church Defendants' final argument relates to damages.  They contend that Doe's fraud claim fails because fraud requires proof of pecuniary damages, and Doe has not alleged and cannot prove any pecuniary damages. The Church suggests Doe's

pecuniary damages would be limited to yearly dues and other assorted expenses that Doe paid the Boy Scouts, not the Church.

First, no rule limits Doe's actual pecuniary damages to the membership dues he paid the Boy Scouts. Actual pecuniary damages could encompass any medical expenses Doe incurred, including fees he paid for counseling. Second, the Court is not convinced that Idaho has adopted a wholesale prohibition against the recovery of mental anguish damages for fraud claims.

Undoubtedly, the general rule is that mental anguish damages cannot be recovered for fraud. *Umphrey v. Sprinkel*, 682 P.2d 1247, 1259 (Idaho 1983). In the typical fraud case involving a commercial transaction, damages arising from severe physical and mental suffering would not normally be within the contemplation of the parties at the time they entered into the transaction or at the time the fraudulent statements were made. *Id.* "But, 'there is no essential reason to prevent a deceit action from being maintained…where other types of interests are invaded; and there are a few cases in which it has been held to lie for personal injuries,….'" *O'Hara v. Western Seven Trees Corp.*, 142 Cal.Rptr. 487, 491 (Cal.App. 1977) (quoting Prosser, Torts (4th ed. 1971) § 105, p. 684).

To illustrate, in this case, Doe was allegedly sexually abused as a result of the Church's purported failure to disclose known dangers of pedophilic Scoutmasters. Assuming the truth of Doe's claims, his sexual abuse was not fortuitous; the Church Defendants' allegedly knew of the danger and said nothing. In these circumstances,

damages for physical and mental suffering would be a foreseeable consequence of the Church's alleged betrayal of Doe's trust and therefore recoverable. As already noted, liability may arise in fraud for harm to a person, and "[t]his liability also extends to the economic loss resulting from the physical harm." Restatement (Second) of Torts § 557A, Comment a, at 149.

Indeed, *McGhee* suggests that Idaho courts would allow a plaintiff to recover emotional distress damages for a constructive fraud claim arising from a breach of trust. In *McGhee*, the Idaho Supreme Court found that second wife could recover damages for humiliation, disgrace, and mental anguish arising from her husband's failure to disclose that he was still married to his first wife when he married her. 353 P.2d at 761.  This case more closely resembles *McGhee* than the typical fraud cases involving a contract or commercial transaction.  In line with *McGhee*, Doe may recover damages for mental anguish that are traceable to the Church Defendants' alleged failure to disclose a known danger.

### D.  *Choice-of-Law Issues*

The Church asks the Court to reconsider Judge Carter's decision finding Oregon law applicable to the instances of abuse that occurred in Oregon now that factual discovery is complete.  It contends that "Judge Carter made clear that, with the case still at the pleading stage, his ruling was based on the possibility that the Oregon abuse could have arisen out of a substantial Oregon-based relationship, such as a week-long official scout camp in Oregon, that would justify application of Oregon law to the Oregon-based

abuse." *Church Defs' Opening Br.* at 2, Dkt. 197-1.  But in his written decision Judge

Carter placed no such limitation on the application of Oregon law to abuse claims

occurring in Oregon.  He never said that Oregon law applied to Oregon abuse only if Doe

proved that the abuse occurred during a week-long trip at an established Scout camp.

Indeed, Judge Carter never mentioned a fixed-location requirement, like an official

established camp, or some temporal baseline, like an overnight trip, to justify application

of Oregon law to Oregon abuse.

To the contrary, Judge Carter found that Oregon law applied to the Oregon abuse

because the conduct at issue occurred in Oregon and the injury was "acutely felt in

Oregon."  *Order* at 10, Dkt. 109.  In fact, he said that "[g]iven the murkiness of the

relationship between the parties and the parties' residence, the undisputed location of the

conduct ***overwhelms the remaining factors***." *Id.* at 12. This conclusion does not change

because the sexual abuse happened during a brief day trip rather than during a week-long

excursion at an official scout camp; the abuse still occurred in Oregon and the physical

injury was still acutely felt in Oregon.  Judge Carter's written decision remains the law of

the case.

### 3.  The Boy Scouts' Motion for Partial Summary Judgment

Doe does not narrow his fraud claims against the Boy Scout Defendants to just

those representations or omissions relating to Arnold. Both fraud claims – institutional

fraud by omission and constructive fraud – remain against the Boy Scout Defendants.

Specifically, Doe alleges that the Boy Scout Defendants knew, since at least 1920, that

men had been using scouting to sexually prey upon young boys, but they failed to disclose this to Doe.  Doe also alleges that the Boy Scout Defendants learned through their agent prior to Doe's abuse that another Scout in the same troop had accused Arnold of molesting him. But the Scouts did not disclose this information either.  Although Doe asserts two claims for fraud against the Boy Scouts, Doe maintains that the "two claims are analytically the same under Idaho law." *Pl's Resp. to Boy Scouts* at 14, Dkt. 203. Both rely on a duty to disclose arising from a confidential or special relationship.

Doe's claims against the Boy Scout Defendants are also analytically identical to Doe's constructive fraud against the Church Defendants.  The Boy Scout Defendants therefore attack Doe's fraud claims on many of the same grounds as those asserted by the Church. The Court will therefore first dispense with the Scouts' arguments that overlap with those arguments already made by the Church.

The Boy Scouts, like the Church, argues that fraud claims can arise only in a commercial transaction.  As already discussed, the Court disagrees.  Doe's fraud claims against the Boy Scouts will therefore not be dismissed on this basis.  Likewise, Doe's fraud claims will not be dismissed because he seeks personal injury damages instead of economic losses stemming from a commercial transaction.  For the same reasons discussed above, Doe may recover damages for physical and mental suffering that are traceable to the Boy Scout Defendants' alleged failure to disclose a known danger.

The Boy Scout Defendants' remaining arguments rely on some of the same legal theories as the Church's, but they rely on different facts.  The Court will therefore examine those arguments in more detail.

## A. *Duty to Disclose*

The Boy Scouts promotes itself as an organization that inculcates in its members such values as trust, loyalty, helpfulness, friendship, courtesy, and obedience.  The Scouts ask that its leaders be a "wise friend to whom [the Scout] can always turn for advice." *Pl's SDF* ¶ 33.  At the time Doe joined the Scouts, Scoutmasters were required to take "responsibility for the moral education and care of other people's children." *Id.* ¶ 38. The Boy Scout's 1962 pamphlet "Securing a Scoutmaster," listed "Qualities of a Good Scoutmaster," including "A liking for boys and ability to win their friendship," and "Stature in the community that will win the confidence of parents and institutional leaders." *Id.*  Based upon those characteristics, Parents were encouraged to entrust their children with Scoutmasters on day-long and overnight fishing and camping trips.

The Scout Defendants deny that they had a duty to disclose the risk of sexual abuse by adult male volunteers involved in the scouting program.  This denial seems to be at odds with many of the basic tenets of scouting – trust, loyalty, friendship and reverence.  The Scouts argue, however, they did not owe Doe a duty to disclose dangers of sexual abuse at the time he joined because there is no evidence that Boy Scouts of America knew Doe or communicated with him prior to 1964 when Doe joined Troop 101.

There are a number of problems with this argument.  First, it ignores that the Boy Scouts of America, the national organization, works through its local Councils and Scout leaders. As Doe joined the Scouts through the local ward of his church, he presumably knew someone in the local Scout organization. And even if he did not, he would have had to talk with someone in the Boy Scout organization before joining.  So any claim that the Boy Scout Defendants did not know or talk to Doe before he joined simply does not make sense.  *Anderson*, 477 U.S. at 255 ("the evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings.")

Second, the argument presupposes that any duty to disclose a known risk of abuse by Scout leaders began and ended when Doe initially signed up for the Scouts.  Scout Defendants rest this argument on the premise that this case involves one transaction: Doe joining the Scouts.  But – accepting fraud requires inducement to do something – that "something" in this case is not limited to Doe's joining the Scouts. Once Doe registered with the Scouts, he was not bound to the organization until his 18th birthday. Each year brought another opportunity to reenroll. Moreover, each time he went on an overnight camping trip with his Scoutmaster and troop, and each time he was asked to go on a day-trip alone with his Scoutmaster, Doe was required to make a choice about the extent of his involvement in scouting.  In short, the decision to become involved in scouting was not monolithic; it was a series of decisions made throughout his teen years and each time Doe made a significant decision regarding scouting, such as going on an overnight scouting trip, a duty to disclose could arise.

MEMORANDUM DECISION & ORDER - 27

Unlike an arms-lengths business transaction, a minor joining the Scouts does not give rise to the same relationship as the relationship between contracting potato farmers. *C.f. Mitchell v. Barendregt*, 120 Idaho 837, 844, 820 P.2d 707, 714 (Ct. App. 1991). Nor is it like a run-of-the-mill vendor-vendee relationship. *C.f. James v. Mercea*, 277 P.3d 361, 365 (2012). Boy Scouts are young boys. They "meet regularly in small groups (often in private homes) that are intended to foster close friendship, trust and loyalty,..." *Curran v. Mount Diablo Council of the Boy Scouts*, 72 Cal.Rptr.2d 410, 952 P.2d 218 (1998). And they go on overnight camping trips with their Scoutmaster.

One dissenting judge explained how the Boy Scouts and its volunteers, who are responsible for the care and well-being of vulnerable and impressionable children, voluntarily step into the shoes of the parents:

> Think about it. Each year thousands of young boys wave goodbye to mom and dad and go off to attend remote boy scout outings across the continent. Some of these expeditions last a week or more.  There they are – out in the wilderness – no phone, no parents, no police, no teachers, none of the usual safety nets.  Just the birds and the bears and the Boy Scout leaders.  If that is not a description of taking custody so as to deprive one of normal opportunities of protection, I do not know what is.

*Doe v. Goff*, 716 N.E.2d 323 (Ill. Ct. App. 1999) (Breslin, J., dissenting) (disagreeing with majority determination that scout leader's sexual abuse of a boy scout was unforeseeable).  Presuming proof of an established and close connection between a child and an organization, a reasonable basis exists, "informed by both common sense and common experience," to impose a duty to disclose a known risk of sexual abuse.  *Fortin*, 871 A.2d at 1222. Unlike an arms-length business transaction between two adults, the

facts and circumstances here indicate that Doe reposed trust in the Boy Scouts, and the Boy Scouts occupied a superior position of influence and authority over Doe.

A reasonable jury could find that the Boy Scouts Defendants owed Doe a duty to disclose the alleged risk of sexual abuse by adult male volunteers involved in the scouting program. This duty is not a negligence duty – instead it arises from an alleged relationship of trust and confidence.

**B.** *Agency and Knowledge*

The scope of any duty to disclose by the Boy Scouts Defendants would naturally be limited by the extent of the Scout Defendants' knowledge regarding the risks of sexual abuse in scouting. Doe contends that Scout Defendants knew and hid specific knowledge of Arnold's earlier abuse of another boy scout. Doe bases this claim on Richard White's testimony that he told Bishop Hales, prior to the abuse of Doe, that Arnold had molested White's own son. The Scout Defendants deny having any specific knowledge regarding Arnold's prior abuse of White's son. They maintain that Hales had neither actual nor apparent authority to receive notice on behalf of the Scout Defendants.

It is true, as Doe states, that the Scout Defendants knew what their agent knew. *Mason v. Tucker & Associates*, 871 P.2d 846 (Id. Ct. App. 1994). The knowledge of the purported agent must have been acquired during the course of the agency relationship for it to be imputed to the principal. *Id.* Where there is no actual authority at the critical time, the third party giving notice must reasonably believe that the putative agent is authorized to receive notice for the putative principal based upon conduct by the principal toward the

third party. *Jones v. Healthsouth Treasure Valley Hosp.*, 113, 206 P.3d 473, 477 (Idaho 2009). Under Idaho law, existence of actual or ostensible authority is a question of fact. *Idaho Title Co. v. American States Ins. Co.*, 531 P.2d 227, 230 (Idaho 1975).

The Boy Scouts of America is a vertically integrated organization.  The national organization sits at the top.  It sets the goals of the national organization and standards for local leadership, and relies on the lower levels to implement those goals.  The lower levels include the local Councils, such as Defendant Ore-Ida Council, as well as the local scout leaders and troop committees. The national Boy Scouts organization controls the local Councils, charging them with carrying out the purposes of the Boy Scouts of America at the local level.  "Councils maintain the standard and policies of the Boy Scouts of America, as well as provide adequate leadership and finances." *Pl's SDF* ¶ 40. The local Councils are the proverbial "boots on the ground."  As explained by one past BSA executive, the local Councils are the "eyes and ears" for the national organization. *Id.*  Bishop Hales served as the "Chartered organization representative" for the troop sponsored by the Nampa 2nd Ward, and was a voting member of Defendant Ore-Idaho Council from at least 1960 through 1964.

Given these facts, a jury could conclude that any notice Bishop Hales received could be imputed to the Boy Scouts of America.  BSA controlled the Ore-Idaho Council, as a local arm of the Boy Scouts, and the Ore-Ida Council controlled Bishop Hales with respect to his scouting duties.  Indeed, construing the facts in Doe's favor, Bishop Hales

was in fact the "eyes and ears" for the Boy Scouts of America.  Thus, notice to him could reasonably be considered as notice to the Scout Defendants.

### C.  *Materiality and Reliance*

The Boy Scouts contend that Doe's institutional fraud claim also fails because Doe cannot satisfy the materiality requirement.  In this regard, the Boy Scouts argue that any information regarding the purported risk of sexual abuse in scouting was not material because the rate of abuse was statistically insignificant.  The Scout Defendants fault Doe for not presenting evidence that the rate of sexual abuse in scouting was greater than the risk for sexual molestation in society generally.

The Boy Scouts made a similar argument in *Juarez v. Boy Scouts of America, Inc.*, 97 Cal.Rptr.2d 12, 31 (Cal.App. 1 Dist. 2000), which the California court rejected. In that case, the Boy Scouts presented statistics reflecting that a child was at greater risk for sexual molestation in a child care center or family setting than in a scout troop, and therefore, argued the Scouts, the risk of harm to the plaintiff was not foreseeable. *Id.* at 30-31.  Despite the statistical improbability of a boy scout encountering a pedophilic scoutmaster, the court nevertheless concluded that children engaged in organized group activities – in particular overnight activities – are at risk of foreseeable sexual abuse.  *Id.* It explained, "the persuasive force of any statistical analysis is severely undercut by a factor recognized in the 'Boy Scout Handbook': 'Studies have demonstrated that more than half of all incidents of child abuse are never reported because the victims are too afraid or too confused to report their experiences.'"  *Id.*

The *Juarez* court's analysis addressed the foreseeability of harm, but its basic reasoning applies. It is not a great leap to say that knowledge of a reasonably foreseeable harm could be material to deciding whether to engage in overnight scouting activities or to take day-trips alone with a scoutmaster.  As in *Juarez,* simply citing the statistical improbability of encountering a sexual molester in the course of scouting activities does not establish, as a matter of law, that the risk of sexual molestation is so remote that a child need not be told about the risk of sexual abuse by a Scoutmaster. 97 Cal.Rptr.2d at 31. Although Doe may face an uphill battle in proving his institutional fraud claim, he has submitted enough evidence to present this issue to a jury.  Likewise, the issue of Doe's justifiable reliance is a jury question.

### 4.  Conclusion

In conclusion, the Court will deny both the Church and the Scout Defendants' motions for partial summary judgment on Doe's fraud claims.  The Court does not know whether the claims will bear out at trial, but Doe has presented enough evidence to present the issue of fraud to a jury.

### ORDER

IT IS ORDERED THAT:

1.      LDS Church Defendants' motion for partial summary judgment (Dkt. 197) is DENIED.

2.      The Boy Scout Defendants' motion for partial summary judgment (Dkt. 198) is DENIED.

3.     The LDS Church Defendants' Sealed Motion to Strike (Dkt. 209) is

DENIED.

DATED: August 31, 2012

B. Lynn Winmill
Chief Judge
United States District Court